Crew, J.
Two questions are presented by this record, either of which if answered in the affirmative disposes of this case and determines the judgment proper to be entered herein. They are: 1. Was the defendant below, The Cincinnati Gas & Electric Company, after verdict, entitled to have judgment entered in its favor upon the pleadings? 2. Is said company, upon the record here presented, entitled to judgment upon the undisputed facts?
The first of the above propositions must, we think, upon authority of Lovell v. Wentworth, 39 Ohio St., 614, be answered in the negative. The first clause of the syllabus in that case is as follows: “If no reply is filed to an answer of new matter constituting a defense, but the case is tried without objection, as though such allegation had been denied, a demand for judgment on the pleadings after each party has introduced his evidence, is too late.” In the present case the demand for judgment was not made by the defendant until after the verdict. The case was tried without objection, and as though the allegation of contribu *124 tory negligence in the answer had been properly put in issue by a reply. By treating this allegation as if denied, and proceeding to trial upon the merits as though issue had been joined upon this averment of the answer, the defendant below waived its right to demand a judgment on the pleadings, and its motion asking that judgment be so entered was therefore properly overruled. Lovell v. Wentworth, supra; Franc v. Nirdlinger, 41 Ohio St., 300; Woodward v. Sloan, 27 Ohio St., 592‘
2. Is the plaintiff in error entitled to judgment in this case upon the undisputed facts? We learn from the record, that the plaintiff below, Ben Johnston, had been in the employ of The Cincinnati Gas & Electric Company as a laborer, for at least five years immediately preceding the 8th day of May, 1902, which is the day on which he was injured. His work was that of coal shoveler, and his place of work on coal barges in the Ohio River at the dock or landing owned, by the defendant company and known as the East End Gas Works in the city of Cincinnati. This dock or landing is located at the foot of an incline plane railway, on which, by means of cars, the coal is carried from the boats or.barges to the retorts of the company, where it is used. In unloading a barge it frequently becomes necessary to shift or move the same, in order that the coal may be taken out from different parts of the boat, and in this manner the weight on the barge be kept properly distributed. When a barge has been emptied it is necessary to shift or change its position so as to permit a loaded barge to take its place, and in removing the empty barge from its position next *125 the shore, it is necessary to handle and use a heavy timber or spar. .When a barge is emptied the workmen at once remove it, and in doing so are required to use this spar. The number of shovelers that were employed on a barge varied from time to time from four to eight or ten. On the morning, and at the time, when Johnston was injured there were four men on the work, and when they had emptied the barge on which they were working they proceeded to move it out into the river, using this spar. In handling or lifting the spar Johnston was injured. The only default or negligence charged by plaintiff in his petition against the defendant company is: “that the said defendant wrongfully and negligently failed to furnish and provide sufficient help to lift the spar so as aforesaid lifted by plaintiff and three fellow-servants.” On the trial of this cause in the superior court, the plaintiff being called as a witness in his own behalf, testified as follows:
Direct Examination.
Q. Mr. Johnston, you are plaintiff in this case? A. Yes, sir.
Q. Where do you live? A. I live on Fourth street.
Q. How long have you lived in Cincinnati?A. Forty-two years I am here.
Q. How old are you? A. Fifty-five.
Q. Where were you employed on the 8th of May, 1902? A. With the gas company, in the East End; East End Gas Company.
Q. What was your employment there? A. Shoveling coal at-the river.
Q. In the bargees? A. In the barges, yes.
*126 Q. How long have you.been employed there? A. I have worked, off and on there, about five years.
Q. You mean before this accident? You haven’t worked there since. A. No, sif; I have not worked any since, no, sir.
Q. Five years before, at the same kind of work? A. Yes, sir.
Q. Now, just explain to the. jury ■ how this accident happened. A. Yes, sir; I was working, the day I got hurt I was working on the coal boat, not a barge, a coal boat; that would measure about eight feet in diameter, and the coal boat would measure twelve feet—
Q. You mean in depth? A. Yes, that is what I mean; twelve foot lift; that is what strained myself, lifting, it was twelve foot; it was not a barge; a barge is only about eight feet.
Q. It was a coal boat? A. Yes, sir.
Q. Now, that was fastened to the bank with a spar, was it? A. Yes; that spar stands in between the barges, like this (illustrating), and when they want to get a barge out, one end of it you have got to raise up, so the barge can pass out, one end of it you have got to lift it up on the lashing (?) so the boat can pass under it.
Q. How large was this spar about? A. Something higher than thirty-six feet long.
Q. And how large square? Well, maybe it might be about twelve inches, something like that, thick.
Q. Who was working on the boat with you at the time? A. Shepard Carpenter, John Holland and John Ryan.
*127 Q. Were you working under the direction of the foreman? A. Yes, sir.
Q. Under whose direction were you working? A. Mr. George Henson.
_Q. What was George Henson’s position there? A. He was the foreman.
Q. He is a white 'man, is he? A. Yes, sir.
Q. Then you four men were working on the boat. A. Yes, sir; in the morning when we started we had five men, and we had a man that done the dumping, John Cain, and along about eleven o’clock, a friend of his had died, on Eastern avenue, and he went to the funeral, so that left us only four men. And Mr. Henson said, “I have been around, boys, to try to get other men; but you boys do the best you can. I want you to help me out.” And I knowed what he meant. Well, when he went away, he said, “I don’t want you men to catch the spar until I give the word; when I give the word I want every man to catch .hold of it and lift what he can.” And so the boys said “All right.” And we caught hold of it, and I was the tallest man in the crowd, and I had my shoulder against it, and the boys had theirs, and it got so they could not reach it, and they had to step in front of me so they could reach it to lift it, and that left the end rest on my shoulder.
Q. What was the effect ? A. It broke the rim of my stomach loose.
Q. Ruptured you? A. Yes, sir.
Q. Now, Mr. Johnston, tell the jury whether or not at any time prior to that, four men, to your knowledge, had undertaken to handle that spar? A. That spar? Well, from eight to nine men, *128 just as many as could get-around it; but we didn’t have only just we four men, that is, we hadn’t only us four men lifting, and it is too heavy; but they could not get no men. Mr. Henson said he could not get nobody. He said, “We will have to try to do the best we could.”
Q. What was the customary number of men used to lift that spar, Johnston? A. We generally have nine to ten men, and sometimes more than that; but I never knew them to go to lift it with four men. They generally have more than that; that is, along in the summer season of the year, the men was warm working up there in the house, the men working down there, and that left a shortage—
Q. Never mind that.
Cross-examination.
Q. And you are fifty-five years old, you'say? A. Yes, sir; I am fifty-five years old; I have been a good stout man.
Q. And you say you worked for the Cincinnati Gas Company for about five years. A. Yes, sir.
Q. Before this accident; before you got hurt? A. Yes, sir.
Q. For five years? A. Yes, sir.
Q. Had you been working at the East End Gas Works all that time? A. Yes, sir; but sometimes, when the ice bothered up there, I would come down here, and then I would go back up there.
Q. Well, were you working at .that particular *129 place, on that coal boat, or coal landing, all of that five years? A. Oh, yes, sir; that is, I didn’t do any other work much around there; I always worked at the river.
Q. You always worked at the river ? A. Yes, sir; they always kept me at the river; I did about a half a day’s work in the yard the whole time I was there.
Q. And all the rest of the time you were working right down here on this boat, right down at the river? A. Yes, sir; in the East End, worked most all the time.
Q. What else did you do beside shovel coal? A. Which, down there at that time?
Q. Yes, for all those five years? A. Oh, outside, when I was not working, the rest of the time ?
Q. No, when you were shoveling' what else did you do down there for tlie company except shovel coal? A. That is all, shovel coal; there was not nothing else for me to do but shovel coal.
Q. Did you ever handle that spar before? A. • Yes, sir.
Q. .Handled that a great deal before, didn’t you? A. Yes, sir, we did a great deal handle it, but we had plenty of help, too.
Q. You had plenty of help? A. Yes, sir.
Q. And it was part of the duty of coal shovelers to handle that spar? A. Yes, that is what we had to do.
Q. That was one of your duties? A. Yes, sir. ■
Q. And how long had that spar been there? A. I don’t know; if was there when I went there.
*130 Q. It was there when you went there? A. Yes, sir. ' .
Q. You handled that spar for five years, didn’t you? A. Yes, sir; off' and on.
Q. And how often would you„handle that? A. A day?
Q. Yes. A. Well, it would be pretty hard to tell.
Q. You would handle that every day? A. Yes, have to handle that every day.
Q. You had to handle that every day during all those-five years? A. Yes, have to handle it; you can’t pass any boats up without.
Q. Was that a pretty heavy spar? A. Yes, pretty heavy; no mistake about that; it was pretty heavy timbér. .
Q. And you knew that was heavy? A. Yes, sir. ■
• Q. You had handled it all that time? A. Yes, sir.
Q. Do you know what it weighs? A. I don’t know what it weighs, but I knew it was mighty heavy.
Q. And you knew that all the time? A. Yes, sir.
Q. You knew that morning before you men got hold of it, it was going to be a pretty- heavy lift? A. Yes, I did; and I done my best.
Q. Was Mr. Henson standing by? A.- Well, Mr. Henson was standing in the coal boat, at the lashing, and every time it would give a little he would take up what he could and as quick as he could and fasten it up on top of the coal boat. When we would make a lift he would try to catch *131 it up. We would lift one end at a time, then when we would get one end up we would go and lift the other then.
Q. What time of day did this occur? A. It was along about between eight and nine o’clock in the morning.
Q. What had you been doing before that in the morning. A, Shoveling coal down from the barge.
Q. When did Mr. Henson speak to you about doing this work, 'moving that spar? A. He speaks to us any time he gets ready- for us; when the digger gets on near you on the.boat and they can’t go any farther, then you have got to move your boat up so they can dig.
Q. And you have been doing that right along for five years? A. Yes,'sir.
Q. And do you remember that he asked you to do that this morning, to lift it up; he told you to lift it up? A. That is right, yes, sir; Mr. Henson told us that.
Q. Where was he when he told you that? A. Up on top of the coal boat, right up on top.
Q. And he called to you to go ahead and do that? A. Yes, sir, and he done sent us off the boat up there to lift it; we walked .up ahead of him.
Q. And he told you to do it? A. Yes, sir.
Q. And you four started off to do it? A. Yes, isir.
Q. Like you had done it many times before? A. Yes, sir; but no four men.
Q. No, no four men had done it before? A'. No, sir.
*132 Q. But you started to go and do it. A. Ye;s, sir.
Q. Did you call out to Mr. Henson that you thought it was too heavy? A. No, sir; I never do anything like that. If the boss told me to do anything I just go and try it.
Q. But you made no protest to him? A. No, sir.
Q. Now, what kind of a man is Mr. Henson? A. I don’t think there is a better boss man on the Ohio River than Mr. Henson.
Q. Is he a tyrannical man? No, sir; nothing like that.
Q. And he never told you to do the work, and if you don’t want to do it, to get out of the job, did he? A. No, sir.
Q. He never talked that way? A. No, sir; never talks that way; I never knowed him to talk that way.
Q. Were any of the other three men who helped you lift that weight injured? A. Not that I know of.
Q. As far as you know, they were not? A. No, sir; I don’t think they were.
Q. Are they still working for the gas company? A. Yes, still working there yet. I think Mr. Ryan is, and Mr. Carpenter and Johnny Ryan, both,. I think they are all working for the gas company.
Q. And none of them were hurt that morning? A. No.
*133 Q. Did you ever see Mr. Henson handle that? A. Yes, sir; I see Mr. Henson lift many times.
Q. He did? A. Yes; but he could not do it that morning, because he had to get up on top of the boat.
Q. You had seen him do that, and you done it a great deal of tener than he had? A. Yes, sir.
Q. You had handled the same spar a great deal of tener than he .had? A. Yes, but I had more help.
Q. Of course, when you got hold of it that morning you knew there were only three men besides yourself? A. Yes, sir.
Q. You knew that perfectly? A. Yes, I knew that, sure.
Q. That was perfectly apparent? A. Yes, sir.
Q. Did it ever occur to you, when Mr. Henson told you to lift that thing up that morning, that if you didn’t go down there he would discharge you from the job? A. Mr. Henson?
Q. Yes. A. No, sir; I didn’t have a bit of. fear of that.
Q. Was not afraid of that? A. No, sir; not at all.
Redirect Examination.
Q. D.id it occur to you that there was any danger of hurting yourself in lifting that? A. Oh, no, no. I didn’t think there was at all; I didn’t think there was at all; no, sir; I was discharging my duty as a man, I thought. That is what I was. I either do a man’s work, or quit; I don’t wait to be discharged; I quit myself, if I don’t do my part of the work.
*134 Q. You didn’t think it would hurt you? A. No.
Q. But you knew it was heavy? A. Yes, sir.
Assuming the foregoing facts to be established, as testified to by the plaintiff, are they, if proven, sufficient to show a right on his part to recover against the defendant company for the injury he sustained? Counsel for defendant in error say in their brief that these facts “make the case of The Van Duzen Gas & Gasoline Engine Co. v. Schelies, 61 Ohio St., 298, perfectly applicable, and it is upon the law as laid down in that case that we rely for the affirmation of the judgments below, and we do not believe it necessary to make any further discussion of the law than a reference to that case.” It would seem also that the view taken by both the courts below was, that the present case, upon its facts, ’is governed and controlled by the rule of law as declared by this court in the above case. In this view we do not concur. The rule announced in the Van Duzen case is not one to be applied indiscriminately 'to all kinds and classes of so-called negligence cases, but, that it may not be put in conflict with certain well established and universally recognized principles of the law governing the relation of master and. servant, must be limited in its application to those cases, which, because of their particular facts, fall within the class of cases to which the Van Duzen case belongs; namely, cases in which the master or his representative, having superior knowledge of a given situation,- assures the servant he can safely undertake a particular work which he is asked to perform, and which, in reliance upon the superior knowledge of the master he therefore undertakes. *135 Or, cases where the master, or one in authority over the servant, peremptorily orders him to do a particular work, apparently dangerous, yet such as a reasonably prudent person, acting under the influence or restraint of such an order, might in obedience thereto properly undertake to perform.
The facts in that case were substantially as follows: Schelies, the servant, at the time the injury occurred was in the employ of the Van Duzen Gas & Gasoline Engine Company as a “vise hand.” He was, in an emergency, called by the foreman from his usual and customary employment to assist in the adjustment of a pump shaft on a pump attached to a gasoline engine, near which at the time was a circular saw then in motion. This saw, by the culpable negligence of the company, was not protected. The shafting which he was ordered to adjust was close, and next to, this revolving saw. Schelies when ordered to perform this service protested, and suggested to the foreman that it was not safe to attempt to do so without first stopping the saw. Thereupon the foreman peremptorily renewed his order, commanding Schelies to proceed with the work. He obeyed this order, using ordinary care, but his clothing was caught by the saw, he was drawn over and on to it, and was thereby seriously injured. Upon these facts and under these circumstances it was held, that what passed between the master and the servant should be held to operate as a transfer of the risk from the servant to the master, and should be considered, and treated as an assumption by the latter of that particular risk. It was not intended by the decision in the Van Duzen case to overthrow and abolish, in Ohio, the entire doctrine of assumption of *136 risk, for the court in that case say: “It therefore follows that the servant can have no relief against his master for injuries resulting from known and obvious dangers, avoidable by ordinary care, however culpable the master may be in the matter. All such injuries, togethef with such as happen where there is no fault on the part of the master, are in the ordinary language of the law, assumed by the servant.” Recognizing and affirming the rule thus stated, to be the well settled -general rule of law, the court in that case denied to the master the right to invoke its protection, only because it was there shown that the master had waived such right, by the doing of that which under the facts and circumstances proven, amounted on its part, to the assumption by it of the particular risk.
The case at bar presents no such conditions, or state of facts, as was shown to exist in that case, and is therefore, we think, clearly distinguishable from it. In the present case the evidence does not show that Johnston, the employe, was suddenly called from one. department or kind of work, to another, but does show that at the time he was injured, he was then engaged in precisely the same character of work he had been performing daily for at least five years. This work was simple, and the risk and dangers, if any, open and apparent. Johnston was an experienced hand in that particular -work, and there is no evidence even tending to show that the injury he received resulted from any incapacity on his part to understand the character and requirements of the work in which he was then engaged. Again, in this case the order given to the workmen was not a peremptory order, *137 as in the Van Duzen case. What the foreman said, and all he said was: “I have been around, boys, to try to get other men; but you boys do the best you can, I want you to help me out. I don’t want you men to catch the spar until I give the word; when I give the word I want every man to catch hold of it and lift what he can.” This, as shown by the record, was simply an order or direction to • the men to go about the work in the usual way, although perhaps with a less number than were usually employed in moving said spar. The handling of this spar required no special skill, arid involved no risk or peril" except such'as was perfectly obvious to every one. Johnston knew its weight, or at least that it was heavy, and he knew the number of men ordinarily employed in handling it. He knew the conditions and circumstances under which the spar was” to be handled on this particular-occasion, how the work was to be done, and if four men were insufficient to handle it prudently, he knew it. In fact, it does not appear from the record in this case that there was any fact, circumstance or condition within the knowledge of the company that was not equally well known to, and understood by, Johnston. Upon these facts Johnston was not entitled to recover. Pennsylvania Co. v. McCurdy, 66 Ohio St., 118. And the trial court at the close of the evidence, when so requested, should have instructed the jury to return a verdict for the defendant. The judgments of the courts below must be reversed and judgment will be entered by this court for the plaintiff in error..

Reversed.

Shauck, C. J., Summers and Davis, JJ. concur.